IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO.: 2:18-cv-00188 (WOB-CJS)

KELLY BLANCHET                                          PLAINTIFF

VS.                    MEMORANDUM OPINION AND ORDER

CHARTER COMMUNICATIONS,
LLC                                                     DEFENDANT

This employment discrimination case arises from the termination of Plaintiff Kelly Blanchet from her position as a direct door-to-door salesperson for Defendant Charter Communications, LLC.

This matter is before the Court on defendant's motion for summary judgment. (Doc. 62.). The Court previously heard oral argument on this motion and took the matter under submission so that the parties might attempt to resolve the matter. (Doc. 81). Those efforts having proven unsuccessful, (Doc. 91), the Court now issues the following Memorandum Opinion and Order.

### *Factual and Procedural Background*

Plaintiff was employed as a door-to-door direct salesperson for Defendant when she became pregnant in 2015. (Doc. 61 at 30-32). Plaintiff coordinated her anticipated time off from work with

Sedgwick Claims Management Services, Inc. (Sedgwick), a third-party administrator for Defendant who handled all its leave and disability benefit applications. (Doc. 62-1 at 8).

Plaintiff gave birth on July 11, 2016 and was approved for maternity leave. Unfortunately, Plaintiff began to experience postpartum mental health issues. Subsequently, Dr. Annette Reynolds, a psychiatrist, diagnosed Plaintiff with postpartum depression and other serious disorders and opined that Plaintiff was unable to work. (*Id.* at 9).

Due to Plaintiff's diagnosis, Defendant approved Plaintiff for short-term disability (STD) benefits and subsequently approved several extensions. (*Id.*). When those STD benefits expired in January 2017, Defendant approved Plaintiff for long-term disability (LTD) benefits. (*Id.*). Defendant also extended Plaintiff's medical leave from September 4 through September 30, and subsequently through February 1, 2017 as an "Americans with Disabilities Act (ADA) accommodation." (*Id.* at 9-10).

When Plaintiff's medical leave expired in February 2017, she called Sedgwick and requested another leave extension through April 2017, believing she would be able to return by then. (*Id.*; Doc. 74 at 8-9.). Plaintiff alleges that Sedgwick indicated her request would be approved. (Doc. 62-1 at 6). Plaintiff also alleges that she telephoned unidentified employees of Defendant who also

led her to believe that her extension request would be approved. (*Id.* at 8-9).[1]

However, Dr. Reynold's medical documentation during February and March indicated that Plaintiff was still unable to work due to uncompromising mental health struggles, including daily suicidal thoughts, severe anxiety, fear of being in public places, and depression. (Doc. 62-1 at 10). These struggles had resulted in a suicide attempt sometime in February. (Doc. 61 at 53). On February 10, Dr. Reynolds submitted medical documentation to Sedgwick, which stated that Plaintiff was not capable of working at all; any return date was "unknown at this time" but to "expect April 2017." (Doc. 62-1 at 10; Doc. 62-3 at 60).

Considering Dr. Reynold's opinion and the multiple leave extensions already granted, Defendant decided to terminate Plaintiff's employment. Defendant sent Plaintiff a certified letter on March 9, 2017, stating that her termination was effective as of January 10, 2017, the date she had been approved for LTD, but encouraging her to reapply once recovered. (Doc. 61-3 at 4). Plaintiff received and read the termination letter on March 13,

---

[1] Sedgwick kept detailed notes on each disabled employee, including summaries of every communication with the employee and recommendations of treating physicians. The notes in Plaintiff's file do not contain any reference to these phone calls.

3

2017. (Doc. 74 at 9). Defendant did not otherwise contact Plaintiff to inform her about the termination. (*Id.*).

Strangely, Sedgwick called Plaintiff after her termination to tell her that her request for additional leave had been approved. Defendant contends this was due to an employee's mistake. Apparently, Sedgwick had emailed Defendant in early March to ask whether Sedgwick should grant Plaintiff's April extension request. Even though Defendant had terminated Plaintiff's employment the day before, a human resource employee replied on March 10, 2017, and told Sedgwick to grant the request. Sedgwick processed the request as "approved" and called Plaintiff on March 17, 2016 to tell her that her leave extension request was granted and mailed an approval letter to Plaintiff. (Doc. 61 at 43). Plaintiff did not respond to subsequent communications from Sedgwick because she knew she "was already fired." (*Id.*).

Plaintiff's mental health struggles continued for the next several years, but she returned to work after her LTD benefits expired in early 2019. (Doc. 62-1 at 13). However, she never reapplied to work with Defendant. (*Id.*).

Plaintiff has now filed suit, alleging a discrimination claim under the ADA and an intentional infliction of emotional distress claim (IIED). (Doc. 22).

4

*Analysis*

A.  <u>**Standard of Review**</u>

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). While the Court views the evidence in the light most favorable to the nonmoving party, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

B.  <u>**Disability Discrimination**</u>

Plaintiff's first claim is brought under the ADA for disability discrimination. A claim under the ADA may be proven using direct or indirect evidence. *Brown v. Kelsey-Hayes Company*, 814 Fed. Appx. 72, 79 (6th Cir. 2020). When the claim relies on indirect evidence, the Court uses the burden-shifting framework of *McDonnell Douglas*. *Id.* at 79-80. Defendant argues the Court should analyze Plaintiff's claim under this framework. Plaintiff does not contend otherwise, and the record does not appear to contain evidence of direct discrimination. Thus, the Court will analyze the claim using the *McDonnell Douglas* framework.

*McDonnell Douglas* has three stages: (1) a plaintiff must first establish a prima facie case of discrimination; (2) then, the burden of production shifts to the defendant to show a legitimate,

nondiscriminatory reason for the way it treated the plaintiff; and (3) if the defendant does proffer such a reason, the burden of production shifts back to the plaintiff to show that the defendant's articulated reason was pretext for discrimination. *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 298 (6th Cir. 2019).

### a. *Prima Facie Case*

A prima facie case of discrimination requires a showing of five elements: (1) Plaintiff was disabled; (2) she was otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse employment action; (4) Defendant knew or had reason to know of her disability; and (5) the position remained open while Defendant sought other applicants or she was replaced. *Edwards v. Secretary of U.S. Department of the Interior*, 17-4022, 2018 WL 4377158, at *5 (6th Cir. 2018).

Defendant argues that Plaintiff cannot establish the second element because Plaintiff could not perform her job, with or without reasonable accommodations. The Court agrees.

An employee who has not been medically released to return to work and thus cannot regularly attend her job is not "qualified" under the ADA. *Gamble v. JP Morgan Chase & Company*, 689 Fed. Appx. 397, 402 (6th Cir. 2017). Plaintiff's doctor never medically cleared her and had reported to Sedgwick in early February that Plaintiff's "severe depression, cognitive impairment and anxiety

6

prevent her from performing all work duties at this time." (Doc. 62-3 at 60). Additionally, in early March, Plaintiff's doctor reported that Plaintiff's condition had not improved and that she still suffered from forgetfulness, severe social anxiety, depression, panic attacks, and had daily suicidal thoughts. (Doc. 61-6).

Plaintiff points out that her doctor reported to Sedgwick that a return in April 2017 could be expected, a date that Plaintiff felt she would be able to return. However, whether an individual is a "qualified individual" able to work with reasonable accommodations is an issue to be determined at the time of the employment decision. *See* 29 C.F.R. app. § 1630.2(m). Here, the decision to terminate Plaintiff's employment was made in early March. Dr. Reynolds had not cleared Plaintiff to return to work in March, and Plaintiff was completely unable to perform the duties of a door-to-door salesperson through March 2017. (Doc. 61 at 60-61).

Plaintiff also argues that her mental health was improving when she had submitted her extension request, because her medication was taking effect and several stressful family issues had been resolved. Plaintiff argues that Defendant failed to take this into account and thus failed to engage in the interactive process to accommodate her disability required by the ADA.

7

However, Plaintiff's argument does not take into consideration all the circumstances leading up to her extension request. When an employer has "already provided a substantial leave, an additional leave period of a significant duration, with no clear prospects for recovery, is an objectively unreasonable accommodation." *Walsh v. United Parcel Service*, 201 F.3d 718, 727 (6th Cir. 2000). Despite Plaintiff's improvement, her doctor was still unable to provide a specific return date. Plaintiff had already requested and received several extensions of STD and approved leave, and recently had been approved to receive LTD benefits. These indicated that Plaintiff was suffering from unrelenting mental illness with no clear date of resolution.

Plaintiff next argues Defendant failed to verify whether April was a firm return date before terminating her employment. As stated above, however, this argument fails to consider what Defendant had already done to accommodate Plaintiff. Regardless, for extended leave to function as a reasonable accommodation, the employee, not the employer, must establish a firm return date. *Maat v. County of Ottawa, Michigan*, 657 Fed. Appx. 404, 413 (6th Cir. 2016) ("the relevant inquiry" is whether plaintiff showed a "certain or credibly proven end"). As stated above, the great weight of the medical evidence before Defendant indicated that Plaintiff was suffering from unresolved mental health struggles which, by nature, could not be predicted to end on a specific date.

8

Plaintiff points out that her doctor had reported to Defendant to "expect April" as a return date. However, Dr. Reynolds also wrote that any firm return date was ultimately "unknown." A return date for which doctors "hope" is not a "well-defined end" sufficient to qualify as a reasonable accommodation. *Id.* at 413; *Williams v. AT&T Mobility Services LLC*, 847 F.3d 384, 394 (6th Cir. 2017).

Plaintiff also has contended that she was fired while on approved leave. It is true that Defendant approved her extension request to Sedgwick, which resulted in Sedgwick processing her application. Putting aside the fact the approval was a mistake, the evidence shows the request was "approved" after Plaintiff had already been fired. Consequently, Plaintiff could not have been terminated while on approved leave because a terminated employee cannot be on approved leave.

Plaintiff also alleges that she received verbal approval over the phone from several unidentified employees before she received her termination letter. Putting aside potential hearsay issues, the Court finds that this testimony raises no triable issue.

In an affidavit filed after her deposition, Plaintiff states, not that the employee gave verbal approval of her application, but rather that the employee "knew of no reason this would not be approved." (Doc. 74-1 at ¶ 7). Moreover, Sedgwick's notes from

9

Plaintiff's file indicate her request was only "granted" after she was terminated.

The ADA only requires companies to make reasonable accommodations for disabled employees. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015). This does not require companies to remove "essential functions" of the job. *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 850 (6th Cir. 1998).

In sum, the evidence leads the Court to conclude that at the time of Plaintiff's termination, she was suffering from debilitating mental health struggles which prevented her from working in any capacity as a door-to-door salesperson. Plaintiff was not a "qualified individual" for purposes of the ADA, and thus the evidence fails to establish a prima facie case of discrimination under the ADA.

### b. *Legitimate, Non-discriminatory Reason*

If Plaintiff had established a prima facie case of discrimination, the burden of production would shift to Defendant to show a legitimate, nondiscriminatory reason for Plaintiff's termination. Defendant submits it fired Plaintiff because she was unable to perform essential functions of her job and was unable to provide a return-to-work date after exhausting her approved leave.

The inability to perform essential elements of a job without an adequate return date constitutes a legitimate, nondiscriminatory reason for termination. *Walsh*, 201 F.3d at 727.

10

As Defendant has presented a legitimate, nondiscriminatory reason, the burden of production would shift back to Plaintiff to show that Defendant's articulated reason was merely pretextual for actual discrimination.

### c. *Pretext*

To establish that an employer's proffered reason for firing an employee is pretextual, a plaintiff must demonstrate "both that the employer's proffered reason was not the real reason for its action, and that the employer's real reason was unlawful." *Williams*, 847 F.3d at 396. A plaintiff may accomplish this by showing that the proffered reason (1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action. *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir.1998).

As stated above, the evidence only supports a finding that Plaintiff was fired for her inability to work or provide a firm return date. Plaintiff had been approved for LTD, exhausted her STD, and still had not been released to work by her doctor in the face of unresolved health problems. No reasonable jury could find that defendant's proffered reason for its action – that Plaintiff was unable to perform the essential job functions of a door-to-door salesperson – was a pretext for discrimination.

Defendant's motion for summary judgment on Count I thus will be granted.

C.      **Intentional Infliction of Emotional Distress**

To establish an IIED claim in Kentucky, Plaintiff must prove that 1) Defendant's "conduct was intentional or reckless;" 2) that Defendant's "conduct was outrageous and offended generally accepted standards of decency and morality;" 3) "that there was a causal connection between" Defendant's conduct and Plaintiff's emotional distress; and 4) that Plaintiff's "emotional distress was severe." *Humana of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1, 2-3 (Ky. 1990).

Kentucky courts have held that a termination of employment, even if it was done with a discriminatory animus, does not rise to the requisite level necessary for an IIED claim. *Miracle v. Bell County Emergency Medical Services*, 237 S.W.3d 555, 560 (Ky. App. 2007). Moreover, the facts do not show Defendant's conduct was "outrageous and offended generally accepted standards of decency and morality." Defendant granted multiple extensions of medical leave and STD to Plaintiff, and only terminated her in wake of receiving doctor reports stating that Plaintiff was unable to work. And the letter that Defendant sent informing Plaintiff of her termination encouraged her to reapply once she was able to work again.

While Defendant's human resource employee gave Sedgwick approval for her extension request after she was fired, Plaintiff must prove that Defendant's "conduct was intentional or reckless."

12

The record contains no indication that Defendant intentionally or recklessly sent the letter to harm Plaintiff. Rather, the dates and times indicate the approval was truly a mistake.

Defendant did not engage in conduct that was reckless or intentional, nor did its conduct consist of action that rises to the level necessary for an IIED claim. Defendant's motion for summary judgment with respect to Count II of Plaintiff's complaint will thus also be granted.

Therefore, having reviewed this matter, and the Court being advised,

**IT IS ORDERED** that defendant's motion for summary judgment (Doc. 62) be, and is hereby, **GRANTED**. A separate judgment shall enter concurrently herewith.

This 14th day of January 2021.



Signed By:
*William O. Bertelsman* WOB
United States District Judge